(No. 13144.—Reversed and remanded.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN MILLER, Plaintiff in Error.

*Opinion filed April 21, 1920.*

1. CRIMINAL LAW—*what necessary to conviction for receiving stolen property.* To convict a defendant, who purchased a stolen automobile, of the crime of receiving stolen property the prosecution must prove, beyond a reasonable doubt, that when the defendant bought the car he knew it was stolen, and that he received it for his own gain with intent to prevent the owner from again possessing it.

2. SAME—*when fact that the witnesses are convicts affects their credibility.* The fact that witnesses are self-confessed criminals brought to the trial from prison to testify for the prosecution will not justify disbelieving them if it otherwise appears they tell the truth, but their credibility is seriously affected if they knowingly testify untruthfully in part.

3. SAME—*records of former convictions of witnesses are admissible.* Records of former convictions of witnesses for the prosecution should be admitted in evidence when offered, even though the fact that they are convicts appears from the oral testimony.

4. SAME—*cross-examination of convicts testifying for prosecution should not be unduly restricted.* Where the case made by the People rests largely upon the testimony of three witnesses who were brought from prison to the trial and were given their freedom while in attendance at the trial, counsel for the defense should be allowed to cross-examine them as to whether they assisted the prosecution in getting evidence and whether they were promised favors or clemency for such work.

5. SAME—*in prosecution for receiving stolen property the testimony of the thief should be considered as that of an accomplice.* In a prosecution for receiving a stolen automobile, testimony of the party from whom the defendant purchased the car, and who admits stealing it, should be considered the same as that of an accomplice, and such testimony is subject to grave suspicion and should be acted upon with the utmost caution.

6. SAME—*when improper remarks by counsel for prosecution are harmful.* In a prosecution for receiving a stolen automobile, the action of counsel for the State in remarking, interrogatively, during the cross-examination of the defendant, "Now, this isn't the

first stolen property you have bought?" and statements in his argument that the defendant is an "arch-criminal" and "has his men to whom he will dispose of these cars," when not based on the evidence, are improper and harmful although objections are sustained.

7. SAME—*lengthy instructions on doctrine of reasonable doubt are improper.* Instructions given at the request of the People on the doctrine of reasonable doubt which cover two and a half pages of the printed abstract are improper, as tending to impress the minds of the jurors with the conviction that the court had grave fear that they would think there was a reasonable doubt of the defendant's guilt.

WRIT OF ERROR to the Circuit Court of Cumberland county; the Hon. AUGUSTUS A. PARTLOW, Judge, presiding.

BRYAN H. TIVNEN, and WALTER C. GREATHOUSE, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, GLENN RATCLIFF, State's Attorney, and JAS. B. SEARCY, for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

John Miller, plaintiff in error here, was indicted by the grand jury at the March term, 1919, of the Cumberland county circuit court for receiving stolen property, a Ford automobile, for his own gain and to prevent the owner from again possessing it. The indictment charged that on December 10, 1918, Miller feloniously bought, received and concealed one Ford automobile of the value of $500, the property of Ott Watson, lately stolen and carried away, he, said John Miller, well knowing at the time he bought said automobile that it had been stolen. At the October term, 1919, of the Cumberland county circuit court the defendant entered a plea of not guilty, a jury was empaneled, the case was tried and the jury returned a verdict finding defendant guilty, finding his age to be fifty-seven years and that the value of the property was $300. Immediately on the return of the verdict the court ordered the defendant into custody and committed him to jail, and denied a mo-

tion of defendant to be admitted to bail pending a motion for a new trial. Motions for a new trial and in arrest were overruled and defendant was sentenced to imprisonment in the penitentiary at Chester. Defendant then again applied for leave to give bail until he might prepare the record and apply for a writ of error, *supersedeas* and bail. The court admitted him to bail for a period of ten days upon his giving bond in the sum of $25,000, which he gave, and this court having granted his application for *supersedeas* and bail, he has brought the case here for review.

Defendant had been in the automobile business about four years, living and conducting a garage in Neoga, a small town in Cumberland county. Before he engaged in that business he had conducted a livery stable twenty-six years. Some time during the early part of the night of October 10, 1918, a man drove a Ford automobile to defendant's garage and left it there for the night. Defendant was not in Neoga at the time. The next morning the man who left the car at defendant's garage came back there and sold the car to defendant. The car had been stolen from R. O. Watson, the owner. Watson testified the car was stolen the last part of September or first of October, 1918, and that he found it in defendant's garage December 12, 1918, and recovered it.

There is no dispute that Frank Haskell, who testified as a witness for the People, stole the automobile from the owner, Watson, and sold it to defendant. On the question whether defendant knew it was a stolen car the evidence is admitted to be highly contradictory. It is admitted by counsel for the State that the question of defendant's guilt or innocence depends on whether he knew, when he bought the car, that he was dealing with Haskell and not with Williams, whom Haskell represented himself to be when he sold the car to defendant. The theory of the State is that Haskell was well known to the defendant and assumed the name of Williams to make the transaction appear an honest and *bona fide* one should the owner of the car ever ap-

pear.   The defense was that the man defendant bought the car from was unknown to defendant; that he represented himself to be J. H. Williams; that his home was Alton, Illinois; that there were no liens or claims against the car, which he had owned about a year, all of which could be verified by calling up by long distance telephone a garage at Alton he named; that relying on the truth of the representations, defendant bought the car and paid the seller $350 therefor.   Defendant denied emphatically that he knew Haskell at the time he bought the car, and testified he had never seen him, to his knowledge, before he purchased it.

The questions raised on this record by the assignment of errors are, that the court erred in overruling the motion for a new trial; that the verdict was contrary to and not warranted by the evidence; that the court erred in refusing to admit competent evidence offered by the defendant and unreasonably restricted defendant in the cross-examination of the People's witnesses; that the court gave erroneous instructions for the prosecution; that there was a variance between the indictment and the proof; and that the conduct of the State's attorney and the remarks made by him during the trial and in his argument to the jury were improper and prejudicial.

It was incumbent on the prosecution to prove by evidence, beyond a reasonable doubt, that when the defendant bought the car from Haskell he knew it was stolen, and that he received it for his own gain, with intent to prevent the owner from again possessing it.   Whether the proof on the part of the prosecution was sufficient to establish that fact depends upon whether it was sufficient to prove, beyond a reasonable doubt, that the plaintiff in error knew, at the time he purchased the car, the man he bought it from was not J. H. Williams but that he was Frank Haskell.   The most important evidence on the part of the prosecution to establish that fact was the testimony of Frank Haskell, Sylvester Jackson and Joe Lewis.   Haskell was

serving a term in the penitentiary at Chester under a sentence of the city court of Mattoon, where he was convicted of stealing another automobile; Jackson was serving a term in the reformatory at Pontiac under a sentence of the city court of Mattoon for stealing an automobile in Coles county; and Lewis was serving a term in the Pontiac reformatory under a sentence of the circuit court of Shelby county for the crime of forgery. The court refused to permit the records of the conviction of these three men to be introduced in evidence, but we think it reasonably appears from the oral testimony that what we have said about their convictions and sentences is correct.

Haskell testified that he and Odd Niles about the last of September or first of October, 1918, went to Windsor, in Shelby county, for the purpose of stealing a car. They went to Windsor in Niles' car, stole the Watson car and Haskell drove it away, Niles driving his own car. They drove the car to and left it at a farmer's house not far from Mattoon. Haskell testified he afterwards went to the farmer's house in a taxicab driven by Frank Kinser, took possession of the car and drove it to East St. Louis for the purpose of selling it. While there he heard the sheriff of Shelby county and Watson were in East St. Louis, and he took the car and drove it to Neoga, arriving there some time in the early part of the evening of October 10. He drove to defendant's garage, but defendant was not there and he was told he was out of the village. He left the car in the garage and went and secured lodging for the night. Next morning he went back to the garage, met defendant and proposed to sell him the car. Defendant was getting ready to drive to the country a short distance and said he did not have time to talk with witness. Witness asked defendant to drive his car and try it out, which the defendant did. He was not gone very long and when he returned the subject of sale was renewed, and finally defendant offered to give $350 for the car, which the witness

agreed to accept. He executed a bill of sale for the car to defendant and defendant gave him a check for $350. At witness' suggestion defendant went with him to the bank in Neoga on which the check was drawn, to identify him. When he received the money he went with defendant back to the garage, where he gave back to defendant $200 of the money received on the check and then went to the Illinois Central railroad station and boarded the north-bound train for Mattoon. He does not deny that he represented to defendant he was J. H. Williams and that he lived in Alton, where he had purchased the car, and gave a garage there as a reference to verify his statements if defendant would call them up by long distance telephone. He signed the bill of sale as J. H. Williams and the check was made payable to the same name. He testified the defendant knew who he was; that he (witness) had been formerly in the taxicab business and had often driven through Neoga and stopped at defendant's garage to fix tires or get gasoline and that defendant had called him by his name. On one particular occasion he mentioned being at defendant's garage and defendant addressing him by his name. Sylvester Jackson and Robert Elliott were with him. Sometimes defendant called him young Haskell and sometimes Frank. Another particular occasion he mentioned, on being recalled, of being at defendant's garage, was going there to get a jack to raise a car he had driven off a bridge on the public road and defendant told him he did not have what he wanted. Haskell testified no one was with him when he drove the car to Neoga and that no one was with him when Kinser drove him in the taxicab from Mattoon to the farmer's house where he had left the car after driving it from Windsor. Haskell further testified, on re-direct examination, that defendant told him one time if he ever got a car far enough away so that it would not be "too hot" he would buy it; that this was about three months before he sold defendant this car.

Sylvester Jackson testified for the prosecution that he was acquainted with both Haskell and defendant. He had known defendant three or four years and Haskell twelve or fifteen years. He had been in Haskell's employ in 1917 and 1918. He had been in the presence of defendant and Haskell at the same time. He mentioned one particular time when a car he. was driving broke down and he left it in defendant's garage over night. The next morning he and Haskell went to the garage to get the car and defendant was there. He could not recall anything that was said between defendant and Haskell but thought the defendant called him Haskell. Another time, about the 15th or 16th of October, 1918, when witness and Haskell were at defendant's garage, defendant told Haskell he would like to speak to him, and they walked away and had a conversation which witness could not hear. At another time the witness testified he was at defendant's garage and defendant inquired if he knew where Haskell was, and requested him to tell Haskell, if he saw him, defendant would like to see him. Later the same day defendant repeated the request, and at that time Joe Lewis was with the witness.

Joe Lewis testified for the prosecution that he knew defendant when he saw him but was not acquainted with him; that he knew Frank Haskell; that about the 5th of October, 1918, he heard a conversation between Sylvester Jackson and defendant in which defendant inquired of Jackson if he knew where Haskell was, and told Jackson to tell Haskell defendant would like to see him on important business.

Thomas Elliott testified for the prosecution that he knew defendant by sight but was not acquainted with him; that he was acquainted with Frank Haskell; that he had seen Haskell and defendant in the presence of each other; that at one time he was at defendant's garage when Haskell, with two others, came by in a taxicab and he thought they had a tire repaired; that witness asked defendant to take him back where he had left his car on account of trouble,

but defendant said he had to go to Sigel and Haskell could take him out. The witness testified that while he had seen Haskell at the defendant's garage he did not know whether they were personally acquainted. Defendant was operating a public garage in Neoga.

The foregoing is the substance of the prosecution's evidence to prove that defendant knew Haskell before he purchased the car from him.

Defendant testified positively that he did not know Haskell. When he came to the garage on the morning of the 11th of October he introduced himself as J. H. Williams and proposed to sell the defendant his car. That was about 9:00 or 9:30 in the morning and it was raining. Haskell said it looked like it was going to be a rainy day; that his wife was with him and he did not like to drive his car with her through the mud. At that time defendant was getting a car ready to take his wife out in the country. He told the man (whom we will refer to as Haskell) that he did not have time to talk with him; that he was going to take his wife to the country and was late then. Haskell asked him to drive his car and try it out, which defendant did. On his return to the garage Haskell asked defendant how the car ran, and he said all right. The proposition to sell the car was renewed by Haskell, and after considerable talk defendant agreed to give $350 for the car, which Haskell finally accepted. Defendant told him he was a stranger to him and he did not want to doubt his word but he inquired about him and the car and whether there were any mortgages or claims against it. Haskell told defendant he lived in Alton, Illinois, and bought the car there; that if defendant doubted him in any way he could call a certain garage in Alton which he mentioned and they would tell all about him, and that if the defendant bought the car he (Haskell) would pay the telephone toll. Defendant told him he would have to give him a bill of sale, which he agreed to do, and the bill of sale was written up and signed

"J. H. Williams." Defendant then gave Haskell his check on a bank in Neoga for $350. Haskell said he was a stranger there and would have to be identified before he could get the money. The bank was about two blocks from the garage and was on the west side of the Illinois Central railroad, the garage being on the east side. Defendant agreed to go to the bank to identify Haskell and they went there together. When they went into the bank Mrs. O'Day, defendant's sister, was in the bank. Defendant identified Haskell, the payee of the check, and Haskell indorsed it and the cashier paid him the money. Defendant then left the bank with Mrs. O'Day, and they walked together to her rooming house, which was a half block from the garage. Mrs. O'Day stopped there and defendant went on to the garage. Defendant left Haskell in the bank and did not see him any more. He said he was going north on the train. The train was due at Neoga at 10:47, and it was near that time when the parties visited the bank. Haskell did not return to the garage after the check was cashed and did not at any time or place return to defendant $200 or any other sum he received on the check. Defendant testified he did not know Haskell and did not remember ever having seen him before the time he bought the car; that he took it for granted he was Williams, from what he said; that he had been in the business of buying and selling automobiles for four years; that he bought the Watson car in good faith, in the belief that he could sell it for $400; that he made no effort to conceal it but kept it in his public garage, where it could be seen by anyone who came into the building; that when Watson and the sheriff came to the garage to look for the car Watson said he could describe a number of marks of identification, which he called off and witness examined for them; that he found them as described by Watson and told him it was his car and delivered him the possession; that the side curtains and a curtain that went over the back or top were not on the car but were

in a locker; that as Watson was about ready to drive the car away defendant called his attention to the absence of the curtains and went and got them and delivered them to him. Defendant denied the conversations or statements testified to by Jackson and Lewis.

Stanley Albin, a farmer residing near Neoga, testified he was at defendant's garage the 11th of October when he bought a Ford automobile. The man he bought the car from introduced himself as Williams and said he lived at Alton. Defendant bought the car for $350. The man he bought it from said the road was muddy; that his wife was with him and he wanted to sell the car. In answer to inquiries of defendant about the car the man said something about calling up a garage at Alton or East Alton. Defendant said he would have to have a bill of sale and they went into the office to prepare it. Defendant went to the bank with the party to get the check cashed. Witness was at the garage when defendant returned and saw no one with him. Witness left the garage about twelve o'clock and never saw the man who sold the car after he left with defendant to go to the bank. On receiving the check the man asked defendant to go with him to the bank to identify him, so that he could get the money and get away on the north-bound train. Defendant was back at the garage by eleven o'clock. He was not gone to the bank more than ten minutes. When he returned to his garage witness tried to trade him his Maxwell car for the Ford he had bought.

Frank Barrow testified for the defense that he was in defendant's garage the morning of October 11 and a man came in who said his name was Williams. Defendant was getting ready to drive to the country and asked witness to stay at the garage until he returned. The man who gave his name as Williams wanted to sell his car, and defendant said he was in a hurry and didn't have time to talk. The man asked defendant to drive his car, and he consented to do so. He returned in about an hour and the man re-

newed the talk about selling his car. Defendant inquired if the car was all right,—no mortgages or debts against it,—and said he did not want to buy anything that was crooked, and the man said it was all right,—nothing against it. Finally defendant agreed he would give him $350 for it if the man would make him a bill of sale. The man (whom we will hereafter refer to as Haskell) said his wife was with him and he didn't want to drive through the mud. That was the reason he gave for wanting to sell. It was a rainy day. Defendant told him he was a stranger, and Haskell told him to call up Alton. Defendant said he didn't doubt his word. They made out a bill of sale and defendant wrote the check. Haskell appeared to be in a hurry and said he wanted to get away on the train. When defendant gave him the check Haskell said he was a stranger and didn't suppose he could get it cashed. Defendant went with him to the bank to identify him. He was gone something like five minutes. Witness never saw Haskell after he left the garage with defendant to go to the bank. He never saw anyone with defendant when he returned to the garage. It was probably about twenty minutes before eleven when they went to the bank.

Thomas Lawson, a farmer residing near Neoga, testified for the defense that he was at defendant's garage at the time he purchased the car from Haskell. He heard defendant ask Haskell about the car and if there was any incumbrance or mortgage on it. Haskell said there was not and that it was paid for. Defendant agreed to purchase it and he and Haskell went into the office of the garage. Witness saw the defendant at his desk filling out a check. When he handed the check to Haskell the latter said he didn't know about getting the money on it as he was not acquainted, and defendant said he would go to the bank and identify him, so he could get the money. As they were leaving the garage witness told defendant he wanted to see him, and defendant asked him to wait till he came back.

Defendant returned from the bank by himself. During the talk between Haskell and defendant about the trade Haskell told defendant he could call a certain garage, or the proprietor of the garage, who could tell the defendant all about him. When defendant returned from the bank to the garage he was by himself. Neither Haskell nor anyone else was with him. Witness never saw Haskell after he and defendant left the garage to go to the bank.

Mrs. Katie O'Day, sister of defendant, testified for the defense that she was in the bank when defendant and Haskell came in. Defendant told the cashier to pay the check. The cashier gave Haskell a pencil, with which he wrote something on the back of the check, and that she and the defendant then left the bank together. They walked together to where she turned to go home and defendant went on to his garage. The man who got the check cashed at the bank had stayed the night before at witness' house. He came there with a woman, introduced himself as Mr. Williams and asked for a room. Witness did not see him any more till next morning, when he came out and paid her. She never saw the woman any more. When witness returned to her house from the bank the woman was gone. It was about eight o'clock at night when the man and the woman came to witness' home. The witness testified Haskell did not return from the bank to the garage with defendant. She did not see where he went after leaving the bank. She walked with defendant from the bank to within a half a block of his garage.

Tony Miller, son of defendant, testified that before going into the army he had been in the automobile business with his father and had never seen Haskell around the garage that he knew of.

Odd Niles testified for the defense that he never went with Haskell from Mattoon to Windsor and was not at a house with him in the vicinity of Coles station in connection with the Watson car.

Frank Kinser testified he was in the taxicab business at Mattoon. He drove Haskell to a house near Coles station but could not give the date. Someone was with Haskell, but they got ·in and out of the car in the dark and witness could not state whether it was a man or a woman. Haskell got out and got a car out of a shed. The other party then got out of the taxi and into the car with Haskell, and the witness returned to Mattoon.

The only witnesses who testified on the direct question whether defendant knew Haskell before he bought the car, were Haskell, Jackson and Lewis for the State and defendant himself for the defense. The testimony of Elliott and Morgan for the State was of little or no importance. If there were nothing in the record affecting the credibility and truthfulness .of Haskell, Jackson and Lewis it might well be sufficient to warrant the conclusion that defendant knew he was dealing with Haskell when he purchased the car from him. In our opinion the record discloses facts and evidence which seriously affect their truthfulness and the weight and credit which should be given their testimony. In the first place, all three of them were serving prison terms,—two of them, Haskell and Jackson, for stealing other automobiles, and Lewis for forgery. By *habeas corpus* they were brought to the trial from prison to testify as witnesses for the People. That they were self-confessed criminals would not justify disbelieving them if it otherwise appeared they told the truth, but if they knowingly testified untruthfully in part it would seriously tend to affect their credibility. Haskell testified no one was with him when he drove his car to Neoga on October 10. Defendant and three disinterested witnesses testified he gave as a reason he wanted to sell the car that his wife was with him; that it was raining and he did not want to drive with his wife through the mud. Mrs. O'Day testified he came to her house the night before he sold the car with a woman, said his name was Williams, and he and the woman stayed

in a room in her house over night. On that point Haskell was completely discredited. Haskell testified that after getting his check cashed he returned to the garage with defendant and gave him $200 of the money he received on the check. In this he was directly contradicted by defendant and the same four witnesses above referred to. Three of said four witnesses were entirely disinterested and no reason appears why they should not be believed. The circumstances tend to give additional weight and credit to their testimony that Haskell did not return from the bank to the garage. He was anxious to leave Neoga on a train which was due there at 10:47, and according to the testimony it was very close to that time when the parties went to the bank. Haskell also testified that no one was with him when he went from Mattoon to the farmer's house to get the car and drive it to East St. Louis. Kinser, the man who drove the taxicab, testified there was a party with Haskell; that it was dark when they got in the taxi and he couldn't tell whether it was a man or woman; that both of them left the taxi and got in the car at the farmer's house and Kinser drove back to Mattoon.

Why the court sustained objections to the introduction in evidence by defendant of the records of the indictment, trial and conviction of Haskell and Jackson in the city court of Mattoon and of Lewis in the circuit court of Shelby county we do not know, unless it was because the court thought that fact sufficiently appeared from the oral testimony. The records were competent evidence and should have been admitted.

It appears from the testimony that after Haskell, Jackson and Lewis had been brought to the seat of the court in Cumberland county by writ of *habeas corpus* to testify as witnesses for the prosecution they were not kept in custody by the officers but were allowed their liberty most of the time they were waiting for the trial, which was several days. Haskell testified that the last ten days he had

been at his home in Mattoon, from where he reported to the deputy sheriff every night. On cross-examination he was asked if he was allowed to go home on the promise that he would look up testimony in the case. He was also asked if by what he was doing in the case and reporting to the State's attorney he expected clemency. He was further asked if he and Jackson had been with each other during the last ten days and if they had been working to get evidence during that time in this case, and other similar questions along the same line. The court sustained objections to all these questions. On cross-examination Jackson testified he had been allowed to go free to some extent for eight or ten days and had been at his home in Mattoon part of the time. He was asked if he had been assisting in getting evidence in this case; whether he was made any sort of promise when he was allowed to go home; whether he and Lewis had been together practically all of the time trying to secure evidence for the State,—to all of which questions the court sustained objections. Ojections were sustained to a similar line of questions asked Lewis on cross-examination. We think the court erred in so restricting the cross-examination. To some extent the cross-examination is within the discretion of the court, but clearly in this case a wide latitude should have been allowed in the cross-examination of these three witnesses.

The principal evidence on the disputed point in this case was given by Haskell himself. He admitted stealing the car, and his position was the same as that of an accomplice. A conviction may be had upon the uncorroborated testimony of an accomplice, but it is subject to grave suspicion and should be acted upon with the utmost caution. (*Hoyt v. People,* 140 Ill. 588; *People* v. *Pattin,* 290 id. 542.) There was no corroboration of his testimony that defendant knew him before purchasing the car except the testimony of Jackson and Lewis, and sufficient appears from the record, notwithstanding the restriction of their cross-examination, to

make it apparent that their truthfulness, to say the least, was doubtful. The unusual and illegal proceeding was adopted of allowing them their freedom while in attendance at the trial, but they were not permitted to answer whether they were looking up evidence for the prosecution and whether they had been promised favors or clemency for doing so. If they had not, no harm would have resulted in their so stating. If such had been the truth it was important as tending to affect their credibility. It is unnecessary to express an opinion whether this judgment should be reversed, alone, on the ground that there is serious doubt, from the evidence, of defendant's guilt, for other errors we have mentioned and will hereafter refer to make it necessary to grant a new trial.

During the cross-examination of defendant it was said by counsel for the State, interrogatively, "Now, this isn't the first stolen property you have bought?" The court sustained an objection to the question and it was not answered. In the course of the argument of counsel for the State he said, "John Miller has his men to whom he will dispose of these cars." Objection was made to the statement, and the court remarked, "I don't know of any such evidence." Counsel further referred to defendant as an "arch-criminal," to which objection was made also, and the court remarked, "I think it may stand." These things might not, and perhaps would not, be very serious in some cases. The court sustained an objection to the question on cross-examination, "Now, this isn't the first stolen property you have bought?" But the mere statement or question by counsel was improper and well calculated to create suspicion or prejudice in the minds of the jury. This was followed by the further statement in argument that defendant had his men to whom he would dispose of the cars, and while the only ruling the court made was to remark he did not remember of any such evidence, that did not obviate the effect liable to be produced by the statement.

The court gave for the prosecution four instructions explaining the meaning of the words "reasonable doubt." They cover two and a half pages of the printed abstract and are in the usual form in which such instructions have been given in many cases. No case has been reversed, alone, because of giving such instructions but giving them has been condemned in a number of decisions. In *People* v. *Cotton,* 250 Ill. 338, it was said several instructions explaining the meaning of reasonable doubt did not make the meaning of the term more clear than the words themselves but that a mere redundance would not justify a reversal. In *People* v. *Harrison,* 261 Ill. 517, it was said giving several instructions stating in varying language a single rule of law is improper, as tending to unduly impress the single principle announced on the mind of the jury to the exclusion of other questions of legal importance. In *People* v. *Wallace,* 279 Ill. 139, such instructions were again condemned as improper, the court saying: "Two pages of discussion of the doctrine of reasonable doubt are not illuminating but the reverse. Two lines are better. The effect upon the jury of the instructions brought together in this record upon the question of reasonable doubt could have been only to induce them to believe that in the mind of the court there was grave fear that the jury would think there was a reasonable doubt of defendant's guilt when there was none." In *People* v. *Moses,* 288 Ill. 281, it was said such instructions were unnecessary because there is no better definition of the meaning of reasonable doubt than the words themselves, but they had never been regarded as so prejudicial as to alone warrant the reversal of a judgment of conviction. We cannot doubt such instructions in this case had a material influence on the minds of the jury. The case, on the whole testimony, was admittedly highly conflicting. The credibility of most important witnesses for the People was open to the most serious doubt, and the language quoted from *People* v. *Wallace, supra,* is directly applicable.

Complaint is made of other instructions given for the prosecution and some other errors assigned are argued in the briefs, but as the judgment must be reversed for the errors above referred to we will not further add to the length of this opinion by discussing them. The case, on the testimony, was of such character as to at least require the record to be free from error in the conduct of the trial.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*