(No. 40781.— )

TOM McDONALD *et al.*, Appellants, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(Donald W. Kehr, Appellee.)

*Opinion filed March 28, 1968.*

PEREGRINE, STIME & HENNINGER, of Wheaton, (ROY I. PEREGRINE, of counsel,) for appellants.

HORWITZ, ANESI AND OZMON, of Chicago, and CORRIGAN, MACKAY, QUETSCH and O'REILLY, of Wheaton, (CHARLES E. ANESI and JOHN R. MACKAY, of counsel,) for appellee.

Mr. JUSTICE UNDERWOOD delivered the opinion of the court:

Tom McDonald and North States Oil Company appeal from a judgment of the Kane County circuit court affirming an Industrial Commission award of compensation to Donald W. Kehr of $61 per week for 57 weeks temporary total incapacity and an additional $61 per week for 200 weeks for the loss of Kehr's left leg. Appellants were further ordered to furnish and fit an artificial limb and pay $100 into the special fund. At issue is the existence of an employer-employee relationship and whether the Commission's findings as to accident, notice and causal relationship are contrary to the manifest weight of the evidence.

It is unnecessary, in view of the conclusion we reach, to consider the questions as to the actual identity of claimant's employer or the arguments as to existence of a causal relationship between the alleged injury and subsequent dis-

ablement of claimant, for we are of the opinion that the finding of the Commission that notice was given to any employer is contrary to the manifest weight of the evidence.

Donald Kehr was hired in August, 1961, as a gas station attendant at 702 North Broadway in Aurora. He earlier left school in the sixth grade and went to work on a farm, served 3 years in the army, worked 3 years as an assembler for the Ford Motor Company, secured 3½ years employment as a furniture truck driver, worked in a furniture factory for 1½ years, and then commenced working at the station in August, 1961. His claim for compensation is predicated upon his testimony that while working the 10:00 P.M.-7:00 A.M. shift at the service station on the night of January 31, 1962, he secured from a nearby rack a one-quart can of oil to put in a customer's car; he placed the can on the front bumper of the car and, while attempting to open it, the can fell a foot or foot and a half and struck the great toe of his left foot. He was then wearing white cotton socks, leather loafers and five-buckle rubber overshoes. He testified "it hurt" at that time, but later stated he noticed his toe was red when he went to bed and that he first noticed it hurting when he awakened later in the day. He testified he told the station manager about the incident the following night at work and was told to see a doctor and the manager would take care of it. Claimant did see a podiatrist who testified the toe was red, swollen and the side of the nail slightly infected. While claimant continued working until he entered the hospital on June 15, the condition of the toe gradually deteriorated, despite continued treatment by several doctors. When amputation of the toe failed to produce improvement, claimant's leg was removed at a point several inches below the knee. It is clear that claimant paid at least some of the medical bills as they accrued, prior to June 15, and that he did not present them to his employer for payment.

In the course of the hearing before the arbitrator claim-

ant repeatedly denied receiving medical attention for anything other than colds and a bursitis shot prior to January 31, 1962, except for a shrapnel wound in the neck for which he was receiving a 30% disability pension. He specifically denied that his left foot or left leg had required any earlier medical attention. He also denied seeing Dr. S. D. Goodman until after the January 31 episode. When asked on cross-examination if he had ever seen Dr. Clifford Nyman he said he had forgotten about him but had seen him in 1959 or 1960 concerning his legs and feet which became tired, "hurt a little bit", and burned "on the outside of the arch" "on both feet". He denied seeing any other doctors and could not recall a named insurance company investigator coming to call upon him in December, 1962, and denied he then was asked about other doctors or told the investigator that he had seen Drs. O'Shea, Lowry, Nyman and Zmugg. Claimant's wife also testified before the arbitrator. She denied her husband had, prior to January 31, 1962, worn bandages, splints or appliances on either leg.

At the hearing on review by the Commission the employer called Drs. Nyman, O'Shea, Shanley and Goodman. Dr. Nyman, an Aurora physician, testified, in substance, that he saw claimant on August 9, 1960, in the doctor's office, and that claimant complained of pain and swelling in his left foot which had commenced the preceding February. Dr. Nyman diagnosed the condition as an inflammation affecting the muscle covering on the bottom of the foot, and prescribed a longitudinal pad for the left shoe. The doctor saw Kehr several times in August and on August 17 placed on the left leg a cast extending from the base of the toes to just below the knee; this cast was removed September 2. The foot had improved and claimant was not again seen until October 11 when he stated he had been hospitalized for a week, and Dr. Nyman testified that since claimant was being treated "by the group" at Hines Hospital he did not see claimant again.

Dr. Thomas A. O'Shea, another Aurora physician, testified he first saw claimant on July 23, 1960, and that claimant related a history of pain in the left foot and leg which had troubled him intermittently since 1954; that claimant had a prior history of a 1951 Korean war wound in the upper left thigh; that the leg and foot pain had been mild until February, 1960, but since that date the pain was severe and caused claimant to lose a day from work at intervals of several weeks. However, the doctor stated Kehr's foot was not troubling him at that time and he did not treat him, but told him he should see the orthopedic specialist in their clinic when the foot was sore, and that claimant subsequently returned for that purpose.

Dr. John A. Shanley, an Aurora podiatrist, testified he first saw Kehr on July 12, 1960, and was told by him that Kehr's left leg and foot had pained him intermittently for the past year, sometimes severely, and that a war wound in the left leg was also mentioned. The podiatrist found a marked tenderness throughout the longitudinal arch of the left foot and a slight swelling of the foot. Dr. Shanley taped the foot and prescribed an anti-inflammatory drug. He saw claimant several times subsequently and ultimately suggested he see an internist since the condition might have systemic involvement.

Dr. Goodman, also an Aurora podiatrist, testified claimant first came to his office January 19, 1962, and that the left great toe nail was then ingrown and infected; that the witness removed a small portion of the nail and packed the nail groove with cotton. He next saw claimant on March 2 at which time "he told me that he dropped a can of oil on his toe, on that same toe of the left foot." "[T]he tissue was sort of a purplish discoloration with quite a bit of edema there." Dr. Goodman continued to see Kehr until June 9, meanwhile telling him in March he should see his physician and in May that he should be hospitalized. The condition of the toe gradually worsened.

It was stipulated that the records of Hines Veterans Hospital indicated claimant was hospitalized there from September 7, 1960, to September 15 and seen as an outpatient on November 15 at which time his condition was diagnosed as "causalgia, left lower extremity, etiology unknown."

At the conclusion of the hearing counsel for claimant stated claimant had told him of two more witnesses, and the case was set over for 30 days to enable counsel to present this evidence. At the later hearing claimant called Henry Mullinax, an Aurora resident, who testified he first became acquainted with Kehr at the North States Oil station in January, 1962; that late in January or the first of February his car was in the station being serviced by Kehr when a can of oil slipped off the bumper and fell on Kehr's foot; that Kehr swore, "danced" around on one leg holding his foot and then sat down on the island where the pumps were and rubbed his foot; that the witness offered to take Kehr to a doctor but the latter said he was alone and couldn't leave. On cross-examination of this witness it developed he was absent without leave from the Army at the time he stopped at the station, and that the person in the car with him was a hitch-hiker previously unknown to the witness but whom the witness had taken to the witness's home for an hour's visit and then driven to a point outside of town on one of the main routes where the witness dropped him off at 1:00 or 1:30 A.M. in a snow storm. The witness had not seen Kehr prior to this episode nor did he see him thereafter until March, 1964, some three weeks before the hearing, when he saw claimant in an Aurora restaurant and spoke to him.

Dr. Samuel Rubert, a physician specializing in orthopedics and traumatics, testified before the arbitrator that he examined claimant on November 26, 1962. His findings included conditions which could be Buerger's disease. In response to a hypothetical question he expressed his opinion

that an individual with circulatory pathology "is more susceptible to conditions or to trauma and subsequent undesirable sequelae and conditions than a normal individual," and that there could be a causal relationship between the dropping of the can of oil on the toe and the subsequent developments since damage to the tissue structures in the presence of impaired circulation could result in infection necessitating amputation at a much higher level.

On the basis of the evidence related above, the Commission affirmed the arbitrator's award. On review the circuit court held the Commission's findings as to the party respondent and occurrence of the accident were not contrary to the manifest weight of the evidence, but that its finding as to existence of a causal relationship between the accident and present condition of claimant was contrary to the manifest weight of the evidence and remanded the cause for the purpose of hearing further evidence on the question of causal connection.

At the Commission hearing held pursuant to the remanding order Dr. Rubert again testified. In response to a hypothetical question incorporating the facts testified to by the several doctors whom claimant had denied seeing, Dr. Rubert again stated his opinion to be that a causal relationship would or could exist between the dropping of the can of oil and the subsequent condition of claimant's foot and leg and that such trauma could accelerate or precipitate an underlying condition resulting in the developments which here occurred. The Commission again awarded claimant the original benefits and its award was confirmed by the circuit court.

Claimant was not recalled to testify following his impeachment nor is any logical explanation offered for his testimony which appears to be a deliberate falsification of the condition of his leg, foot and toe prior to the date upon which he claims a can of oil fell on it. Nor is any effort made to explain the discrepancy between the testimony of

claimant's wife that her husband had worn no splints, bandages or appliances on his leg and Dr. Nyman's testimony that he placed a cast on claimant's leg which was worn for several weeks or Dr. Shanley's testimony that he had taped the foot. While claimant's counsel seek to minimize the effect of this impeachment by calling attention to claimant's meagre education and limited understanding, it is inconceivable that one who experienced the leg and foot trouble claimant is conclusively shown to have suffered over a period of several years prior to the claimed injury on January 31, 1962, could have so easily forgotten it. While claimant's formal education was concededly limited, his intelligence and understanding were apparently such as to enable him to satisfactorily drive a truck for several years and serve as the station attendant until disabled. Nor can we agree with claimant's contention that his impeachment related to immaterial matters. The condition of his leg, foot and toe prior to the event in question can scarcely be thought irrelevant to the cause of its subsequent deterioration.

That claimant's testimony as to his previous condition was false, however, does not *per se* require rejection of his unimpeached statements. While appellants urge application of the maxim *falsus in uno, falsus in omnibus* and argue that where a witness wilfully and deliberately misstates the facts on a material point the trier of facts is "forced" to disregard the entire testimony of that witness except insofar as it may be corroborated by other credible evidence, such is not the law of this State. Rather, the rule is that under such circumstances the trier of facts *may* disregard the uncorroborated testimony of such witness. (*Thompson* v. *Northern Hotel Co.,* 256 Ill. 77; *People* v. *Arnold,* 248 Ill. 169.) Since questions as to the credibility of witnesses are ordinarily best left in the hands of those who see and hear them testify (*Cook County* v. *Industrial Com.,* 32 Ill.2d 181), we could leave undisturbed the determination made by the arbitrator and Commission who

chose to believe the unimpeached portions of claimant's testimony which would support an award based upon aggravation of an existing condition (*Allis-Chalmers Mfg. Co.* v. *Industrial Com.*, 23 Ill.2d 497, 500; *Quaker Oats Co.* v. *Industrial Com.*, 414 Ill. 326, 330; *Peoria Railway Terminal Co.* v. *Industrial Board*, 279 Ill. 352, 356), particularly since Dr. Goodman testified that claimant told the doctor, on March 2, that claimant "had dropped an oil can on his toe," and this can be viewed as corroborative of Kehr's testimony as to the occurrence of the accident. However, Kehr's testimony that he told the manager of the station of the episode is still left completely uncorroborated. This is the sole evidence of the statutorily required notice to the employer within 45 days of the injury (Ill. Rev. Stat. 1961, chap. 48, par. 138.6(c),) and it is denied by the manager. Such other indicia of the truth or falsity of this testimony as exist do not corroborate it. While claimant testified he told Richard Briel, the interim manager, of the accident, Kehr says he does not remember whether he told Dale Friestad, the regular station manager who returned from the Army and replaced Briel about the first of March, of dropping the can of oil. Friestad testified claimant did not mention it but, when asked by Friestad what was wrong with his foot, only spoke of having a sore toe about which he was seeing a doctor. Briel also testified that, following amputation of the toe, Kehr told him claimant was going to try to collect from the government, and that someone was going to have to pay for it. Also, it is to be noted that claimant's own conduct was inconsistent with his present testimony for it is clear that, while claimant paid at least a portion of the bills for treatment of his toe between January 31 and June, he neither presented them to his employer nor requested reimbursement. It seems unlikely that an employee, of apparently limited financial resources, whose employer had told him to see a doctor and the employer "would take care of it", would thereafter for a period of some

months pay his own charges for medical treatment without seeking reimbursement.

An award of compensation cannot rest on speculation or conjecture (*Osco Drug, Inc.* v. *Industrial Com.,* 36 Ill.2d 361, 368), and the employee has the burden of proof. (*Osco; Allis-Chalmers Mfg. Co.* v. *Industrial Com.,* 35 Ill.2d 367, 370.) While resolution of factual disputes and questions of credibility are ordinarily for the Commission (*Osco; State House Inn* v. *Industrial Com.,* 32 Ill.2d 160, 164), where its findings are contrary to the manifest weight of the evidence it is our duty to set them aside. (*Rockford Clutch Div., Borg-Warner Corp.* v. *Industrial Com.,* 37 Ill.2d 62, 67; *Arbuckle* v. *Industrial Com.,* 32 Ill.2d 581, 586.) Where the sole support for an award rests upon the claimant's own testimony and claimant's actual behavior or conduct is inconsistent with that testimony, we have held the award cannot stand. (*Rockford Clutch* and cases there cited.) Such, in our opinion, is the situation as to proof of notice to the employer in this case.

While the statute (Ill. Rev. Stat. 1961, chap. 48, par. 138.6(c),) provides that "No defect or inaccuracy of such notice shall be a bar" unless prejudicial to the employer, and we have said the statute should be liberally construed (*Quaker Oats Co.* v. *Industrial Com.,* 414 Ill. 326), the evidence as to notice in this case, both direct and circumstantial, preponderates against claimant's contention that notice was given. We accordingly hold contrary to the manifest weight of the evidence the Commission's finding that notice was given the employer.

The judgment of the circuit court of Kane County is reversed and the award set aside.

*Judgment reversed;*
*award set aside.*