THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
STEVEN GARRETT, Defendant-Appellant.

Fifth District   No. 75-495

Opinion filed December 14, 1976.

Stephen P. Hurley and Ann Hilbert Blandford, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Robert J. Hawkins, State's Attorney, of Fairfield (Bruce D. Irish and Keith P. Vanden Dooren, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. PRESIDING JUSTICE KARNS delivered the opinion of the court:

Defendant-appellant Steven Garrett was convicted in the Circuit Court of Wayne County of the unlawful delivery of substances represented to be MDA and LSD,[1] in violation of section 404 of the Controlled Substances Act, as amended (Ill. Rev. Stat. 1975, ch. 56½, par. 1404). He raises several issues on this appeal. The contention which we find

---

[1] The hallucinogenic substances methylenedioxyamphetamine and lysergic acid diethylamide. See Ill. Rev. Stat. 1975, ch. 56½, par. 1204(d)(1) and (9).

persuasive is that the trial court abused its discretion in curtailing defense counsel's attempts on cross-examination to impeach the credibility of the State's key witness, an informer who had volunteered to set up the drug purchase. The State's case stood or fell on the testimony of this witness, one Ginger Gaither. If believed in full, it was sufficient to prove the defendant guilty beyond a reasonable doubt; if it were not believed, the rest of the evidence was insufficient. Under these circumstances, the defendant had a right to put before the jury, whose task it was to make the crucial factual determination whether the informer's story were true, all his relevant evidence reflecting on her credibility. Any improper restriction of cross-examination designed to show bias on the part of this key witness could not but be prejudicial. Therefore we must reverse and remand for a new trial.

Owen Manahan, the Fairfield chief of police, was the State's first witness. He testified that he was called to the police station about 8:30 p.m. on January 30, 1975, to furnish some money so that Ginger Gaither could make a drug "buy" from the defendant and one Clifford Austin.[2] He had seen Ginger Gaither previously, perhaps once or twice at the police station, but had never had any significant conversation with her. She did not indicate to him any reason for wanting to set up this particular purchase. He and other officers each recorded the serial numbers from one $20 bill and six fives, and the money was given to Ginger Gaither. Chief Manahan saw Officer Jimmy Joe McCleary search the informer's purse and coat pockets before she left to purchase the drugs. She was not searched in the nude by a matron. Later that evening she called and told Chief Manahan that she had purchased some drugs. Late that night Officer Norman Skaggs turned over to Manahan a fingernail file and three small packages which purportedly contained controlled substances. He locked this evidence away until it was sent to the State crime laboratory in Springfield.[3]

Officer Skaggs testified that he had stopped to question Ginger Gaither on January 29 when he saw her hitchhiking. He had met her on one previous occasion. She volunteered to him that Austin and Garrett were "peddling narcotics," that Austin was "dealing big" and hurting a lot of people, and that something should be done with him. He asked her if she would be willing to help, and she said yes. He testified that he did not promise her any money for her help; his impression of her motivation was that she simply wanted to stop Austin from what he was doing. That same night, January 29, she took Skaggs and two other officers by the place

---

[2] Austin was indicted along with Garrett, but their cases were severed for trial. Only Garrett is involved in this appeal.

[3] A criminalist from the Illinois Bureau of Identification, Michael Cravens, testified that he had tested the substances in the three small packages, each of which weighed 0.1 gram or less, and determined the presence of LSD and MDA. Proof of delivery of an *actual* controlled substance was of course not part of the State's burden of proof under section 404.

where she thought Austin and the defendant would be, but no one was home. The next evening about 7:30 Ginger Gaither called the police department and said that if she had $50 she could buy some drugs from Austin and Garrett. Skaggs confirmed Chief Manahan's account of the recording of the serial numbers of the bills and of the search of the informer's purse and coat. He said that the pants she was wearing had no pockets, and that he did not see any place where she could have hidden any drugs. About 9:15 p.m. he transported her to the Horseman's Inn, about half a block from Alice's Restaurant, where she said she had arranged to meet Austin and the defendant. About 11:20 p.m. he received a call on his police radio telling him that a purchase had been made, and he should meet Ginger Gaither at the Horseman's Inn. She handed him three small packages and a small knife, or fingernail file. He went with her to a utility pole east of Fairfeld where she indicated the drugs had been picked up, but was unable to find anything there, although he noticed that the grass between the road and the pole had been trampled. On the way to this spot he saw indications that someone had driven into a ditch beside the road. He also went to Eckleberry's wrecker service and determined that Eckleberry had pulled a vehicle from the ditch earlier that night. He checked the serial numbers on the bills used to pay for the wrecker call, but none of them matched those previously recorded. He then returned with the informer to the police station, put the packages and the knife in plastic evidence bags, marked the bags, and turned them over to Chief Manahan. On cross-examination of Officer Skaggs the following exchange took place:

"Q. To your knowledge, have the police helped her financially since that time?

MR. HAWKINS [the State's Attorney]: Your Honor, I object to that question, being irrelevant to the point in question here at this trial.

THE COURT: Sustained.

Q. Have you ever received any complaint on Ginger Gaither herself?

MR. HAWKINS: Your Honor, I object to that question on the same grounds.

THE COURT: I will sustain the objection; it is too general, among other things. I don't understand what you mean by complaints.

MR. WILLIAMS [defense counsel]: Police department ever receive a complaint from Steve Garrett's mother about Ginger Gaither at their house?

THE COURT: Did you hear that question?

MR. HAWKINS: Your Honor, I would object to this as beyond

the scope of the direct examination and it is a general question.

THE COURT: Also, would call for the best evidence; that's the police record.

MR. HAWKINS: That's correct.

THE COURT: I will sustain the objection.

MR. WILLIAMS: I have no further questions, Your Honor."

Officer McCleary, who searched Ginger Gaither's purse and coat, confirmed that she was not subjected to a nude search before going out to make the purchase. He testified that the reason for the search was "to make sure she didn't have any [drugs] on her person or wasn't no set-up deal." He testified that he found no drugs other than some prescription medicine which was retained at the police station. He went with Officer Joslin to Alice's Restaurant about 9 p.m. After going in and determining that Clifford Austin was there but the defendant was not, the two officers took up positions behind the restaurant so that they could observe the two side doors. As it happened, all the relevant entrances and exits took place on the east side, where Joslin was stationed. Later that night McCleary and Joslin received a radio call that the purchase had been made and they should arrest Austin and the defendant. The two men were found inside Alice's, seated at a table with some other people, and arrested. A twenty and two fives of the prerecorded bills were found on Austin's person. Another of the bills was found among the receipts at Alice's when the establishment closed for the night, but the waitress could not recall who gave it to her. The rest of the money was never recovered.

Officer Joslin testified that Ginger Gaither was supposed to buy the drugs from Clifford Austin, and that it was Austin that he and McCleary were looking for when they entered Alice's at 9 p.m. From his observation post he observed Ginger Gaither, and later the defendant, enter the restaurant. About 10:30 or 10:45 he saw Ginger Gaither leave with Austin and the defendant in a van; shortly thereafter the same three people returned. About 11:15 p.m. he saw the informer leave Alice's with Curtis Austin, the brother of Clifford Austin. At the jail after the arrest, Joslin testified, he searched the defendant thoroughly but found neither money nor drugs.

Clarence Eckleberry testified that he was called at his wrecker service on January 30 to pull a van from a ditch. A girl and two boys, one of them the defendant, were in the van when he arrived.

Ginger Gaither was the State's final witness. She said that she had no drugs on her person at the time the police sent her out with the recorded bills. She testified that she had used drugs in the past, the last time on January 28, 1975. She said that when she went into Alice's she sat down with Clifford Austin, and that later the defendant joined them. They talked about LSD and MDA, which Garrett told her he had. She gave the

defendant the $50, which he put in his left shirt pocket. The three of them, along with one Dave Martin, whose role is not otherwise explained in the record, then left to get the drugs. They went about two miles out of town. On the way Austin drove the van into a ditch. Dave Martin went to a farmhouse to call Eckleberry to tow the van out of the ditch. Austin got out of the van by a telephone pole and returned with the drugs, which were in a clear plastic bag. She did not remember the defendant getting out of the van. Austin, she said, handed her the drugs after they had returned to Alice's and were sitting at a table. The defendant then asked her if he could "snort a few hits" of the drugs, which she permitted him to do, using her fingernail file. She then went to the Horseman's Inn with Curt Austin and called the police. When Officer Skaggs arrived to pick her up, she gave him the drugs and the fingernail file. On cross-examination Miss Gaither testified that she had been a patient, or resident, at the Adolph Meyer Drug Abuse Center in Decatur in May 1974 because of her use of LSD. She said that she had not taken drugs again after her release until October, 1974, when she obtained some from Austin and the defendant. At the time of the events in question, she was taking drugs two or three times a week. She said that she had taken LSD on January 28, and was still high, or "spacey," when she talked with Officer Skaggs while hitchhiking on January 29. She was unclear as to where she spent the night of January 29. Her sister, with whom she was then living, had asked her to leave the house on January 28 because she was high, and she had stayed at one Richard Rogers' house that night. She said that she spent the afternoon with the defendant on January 30, and made arrangements to meet him later that night to buy some drugs. They met as arranged, and then she left, purportedly to get some money from a girl friend. Instead, she went to the police station. She testified that the police did not pat down her clothing before sending her out to make the buy, nor did they look in her shoes. She said that she had never carried drugs on her person before. She liked the defendant and Austin, but didn't like their ways. She had nothing personal against them. Defense counsel asked:

"Q. You blame Steve and Cliff for ruining your life?

A. They didn't help it any.

Q. Would you lie then about anything to try * * * to get back, to try to do something to Steve and Cliff Austin?

* * *

A. No, I wouldn't want them to hurt someone else, though. That's the whole purpose of this trial right now."

Defense counsel's motion to strike the answer was denied.

Defense counsel then asked the witness if she had been admitted to Fairfield Hospital approximately three weeks before trial. The following ensued:

"MR. HAWKINS: Your Honor, I object to this question, being irrelevant.

THE COURT: Yes, that's after the date of the alleged offense and that would be.

MR. WILLIAMS: I can show, link it up with her statement she did not take any drugs afterward—

MR. HAWKINS: Your Honor, I object to this question.

THE COURT: I will sustain the objection.

Q. Did you ever accuse Cliff Austin of being the father of your child, or a child?

MR. HAWKINS: Your Honor, again I object to this question, has nothing to do—

MR. WILLIAMS: I believe it goes to her bias or prejudice as far as her testimony is concerned in this case."

After a conference out of hearing of the jury and the reporter, the objection to the last question was sustained.

The witness testified that defendant did not hand her the MDA or LSD. She did not know who the drugs belonged to. Asked who represented the drugs to be LSD and MDA, she answered "Both of them. I don't know which one. They just said—Steve told me about it first when I was at his house, and later on he got hold of Cliff."

"Q. He got hold of Cliff. You know that for a fact?

A. Cliff was in the bar at the time, that's all I know. He talked to him."

The defense called one witness, Irvin Gene Cunningham, who testified that he knew Ginger Gaither, was familiar with some of the people with whom she associated, and that her reputation for truth and veracity was "[d]efinitely bad." He said that he would not believe her under oath. On cross-examination, he indicated that he based his opinion largely on what he had heard from Ginger Gaither's sister and brother-in-law.

We think it is clear from this recital of the evidence that, without the informer's testimony, the jury could not have found the defendant guilty beyond a reasonable doubt. The defendant's activities, absent the gloss put upon them by Ginger Gaither, would bear a totally innocent interpretation. (See *e.g.*, *People v. Ibom*, 25 Ill. 2d 585, 185 N.E.2d 690 (1962).) No drugs and none of the money provided by the police were found on his person at the time of his arrest. Despite the presence of a number of other people in Alice's at the time of the alleged transfer of money, only the informer testified to this occurrence. Likewise she alone testified to the alleged arrangement between defendant and herself to obtain drugs. The search of the informer by police left open the possibility that she could have had the small quantities of drugs involved here concealed upon her person. As she was not kept under surveillance

by police while she was in Alice's Restaurant and the Horseman's Inn, it is possible that she might have conducted in either place a drug transaction with some other person, without the defendant's knowledge or participation. The defendant's mere presence in the restaurant and the van with Austin would not, of course, be sufficient to make him accountable for an offense that may have been committed by Austin. *People v. Boyd*, 17 Ill. 2d 321, 161 N.E.2d 311 (1959); *People v. Magnafichi*, 9 Ill. 2d 169, 137 N.E.2d 256 (1956); *People v. Adams*, 8 Ill. App. 3d 62, 289 N.E.2d 53 (4th Dist. 1972).

■■ Defendant argues for an outright reversal on the grounds that a guilty verdict cannot be sustained on the uncorroborated testimony of an addict-informer. Even if we agreed that the informer in this case had been shown to be an addict,[4] and that her testimony was entirely uncorroborated, which we do not, we do not think that the rule is as absolute as stated by defendant. The true test was stated in *People v. Norman*, 28 Ill. 2d 77, 82, 190 N.E.2d 819, 822 (1963): "Although the testimony of a narcotics addict must be scrutinized with caution, his testimony may be sufficient to sustain a conviction if credible under the surrounding circumstances."

Our reversal and remand is instead based on the more general rule that the wisest latitude should be allowed the defendant in cross-examination for the purpose of establishing bias, motive, prejudice, or interest on the part of a witness. (*People v. Vagil*, 9 Ill. App. 3d 726, 292 N.E.2d 557 (2d Dist. 1973); *People v. Barr*, 51 Ill. 2d 50, 280 N.E.2d 708 (1972); *People v. Velez*, 72 Ill. App. 2d 324, 219 N.E.2d 675 (1st Dist. 1966); *People v. Soto*, 64 Ill. App. 2d 94, 212 N.E.2d 353 (1st Dist. 1965); *People v. Mason*, 28 Ill.

---

[4] Section 102 of the Controlled Substances Act defines "addict" to mean "any individual who habitually uses any controlled substance so as to endanger the public morals, health, safety or welfare, or who is so far addicted to the use of controlled substances as to have lost the power of self control with reference to his addiction." (Ill. Rev. Stat. 1975, ch. 56½, par. 1102(a).) We need not determine here what distinctions, if any, should be drawn between the credibility of a witness who is, *e.g.*, a heroin addict and that of one who habitually uses the kinds of hallucinogenic substances involved in this case. Most of the cases which state the rule about the suspicion with which an addict's testimony is to be viewed involve the opiates: see, *e.g.*, *People v. Crump*, 5 Ill. 2d 251, 261, 125 N.E.2d 615, 621 (1955), quoting from *State v. Fong Loon*, 29 Idaho 248, 158 P. 233 (1916): "Habitual users of opium or other like narcotics become notorious liars. ° ° ° The chronic morphinomaniac is often a confirmed liar—the truth is not in him. ° ° ° The capacity of a witness to observe and to receive accurate impressions, to retain them in his memory, and to correctly relate them, also his power and inclination to be truthful, are all subjects which go to the credibility of a witness." (See also Annot., 65 A.L.R. 3d 705 (1975), indicating that the vast majority of courts recognize that evidence of drug use at the time of the events testified to, or of general facultative impairment because of drug use, is admissible to impeach a witness' credibility; *People v. Galloway*, 59 Ill. 2d 158, 319 N.E.2d 498 (1974); *People v. Strother*, 53 Ill. 2d 95, 290 N.E.2d 201 (1972).) Drug use *per se*, of course, does not render a witness incompetent to testify. *People v. Dixon*, 22 Ill. 2d 513, 177 N.E.2d 224 (1961).

2d 396, 192 N.E.2d 835 (1963); *People v. Miller*, 292 Ill. 318, 127 N.E. 58 (1920).) As the court said in *People v. Soto*, "This is not a newly-established procedural right, but, so far as we know, traces its origin to the early evolution of the adversary system itself." (64 Ill. App. 2d 94, 99.) Cross-examination, which Wigmore called "the greatest legal engine ever invented for the discovery of truth," is a matter of right. 5 Wigmore, Evidence §1367, at 32 (Chadbourn rev. 1974); *Alford v. United States*, 282 U.S. 687, 75 L. Ed. 624, 51 S. Ct. 218 (1931). As the Supreme Court said in *Alford*:

> "Cross-examination of a witness is a matter of right. [Citation.] Its permissible purposes among others, are * * * that facts may be brought out tending to discredit the witness by showing that his testimony in chief was untrue or biased [citations].
>
> Counsel often cannot know in advance what pertinent facts may be elicited on cross-examination. For that reason it is necessarily exploratory; and the rule that the examiner must indicate the purpose of his inquiry does not, in general, apply. [Citations.] It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop. Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them. [Citations.] To say that prejudice can be established only by showing that the cross-examination, if pursued, would necessarily have brought out facts tending to discredit the testimony in chief, is to deny a substantial right and withdraw one of the safeguards essential to a fair trial." (282 U.S. 687, 691-92, 75 L. Ed. 624, 627-28, 51 S. Ct. 218, 219.

The right of a defendant to confront the witnesses against him, protected by both the United States and Illinois constitutions, includes the right to an effective cross-examination. U.S. Const., amend. VI; Ill. Const. 1970, art. I, §8; *People v. Phillips*, 129 Ill. App. 2d 455, 263 N.E.2d 353 (3d Dist. 1970).

■■■ Inquiries of a witness as to his relations with the accused, his interest in the results of the case, and his feelings of bias, are never collateral. (*People v. Somerville*, 88 Ill. App. 2d 212, 232 N.E.2d 115 (1st Dist. 1967); *People v. McGovern*, 307 Ill. 373, 138 N.E. 632 (1923); *People v. Maggio*, 324 Ill. 516, 155 N.E. 373 (1927); *Blanchard v. Blanchard*, 191 Ill. 450, 61 N.E. 481 (1901).) The relevance of showing that a witness is in the employ of a party has long been settled. (*Chicago City Ry. Co. v. Carroll*, 206 Ill. 318, 68 N.E. 1087 (1903).) Even arrests and charges later dropped, ordinarily inadmissible, may be shown where a witness "might

be coloring her testimony because of an offer of immunity or leniency * * *, or because of the coercive effect of her detention." *People v. Beard*, 67 Ill. App. 2d 83, 88, 214 N.E.2d 577, 579 (1st Dist. 1966).

We must now apply these principles to the particular inquiries which defense counsel was not permitted to make here, and which are now assigned as error. Officer Skaggs was asked whether the police had helped Ginger Gaither financially since the time of the alleged drug purchase. An objection on the grounds of relevancy was sustained. This was clearly in error. The jury was entitled to know the witness' past and current relationship with the police. Likewise, Officer Skaggs should have been permitted to answer the question whether the police had received a complaint from the defendant's mother about Ginger Gaither, as an affirmative answer might have tended to show a further motivation for the witness' testimony.[5] Even more prejudicial to the defendant's attempt to impeach the credibility of the informer's testimony was the court's sustaining of an objection to the question to Ginger Gaither whether she had been admitted to Fairfield Hospital approximately three weeks before the trial. Defense counsel indicated that he could link up this admission to the hospital with her testimony that she had not taken any drugs since January 28, 1975. If the defendant could have shown recent use of drugs by the witness, it would not only affect her credibility for that reason alone but would also cast serious doubt upon the truth of the balance of her testimony. See *People v. Lewis*, 25 Ill. 2d 396, 185 N.E.2d 168 (1962); *cf. People v. McElroy*, 30 Ill. 2d 286, 196 N.E.2d 651 (1964) (allowing such impeachment of a *defendant*).

It was an abuse of the trial court's discretion to cut off these exploratory avenues of inquiry. (*Alford v. United States*.) The cumulative effect of the excluded evidence might well have been sufficient to destroy Ginger Gaither's credibility in the eyes of the jury. Where a witness is successfully impeached, the uncorroborated parts of his testimony may be disregarded by the trier of fact. (*McDonald v. Industrial Com.*, 39 Ill. 2d 396, 235 N.E.2d 824 (1968); *People v. Garrett*, 82 Ill. App. 2d 192, 226 N.E.2d 429 (1st Dist. 1967).) The trial court's rulings prevented the defense from presenting its theory that the State's key witness was unbelievable. (See *People v. Baptiste*, 37 Ill. App. 3d 808, 347 N.E.2d 92 (1st Dist. 1976).) This case is unlike *People v. Steel*, 52 Ill. 2d 442, 288 N.E.2d 355 (1972), in that the jury here was not presented with other overwhelming evidence of the defendant's guilt. Thus we cannot find the

---

[5] We would note that the "best evidence rule," cited by the trial judge as a reason for sustaining the objection to the question, is inapplicable in such a situation. See our discussion of the rule in *Continental Illinois National Bank & Trust Co. v. Eastern Illinois Water Co.*, 31 Ill. App. 3d 148, 159, 334 N.E.2d 96, 106 (5th Dist. 1975), and the authorities cited therein.

error in restricting the defendant's cross-examination harmless beyond a reasonable doubt.

■■■ Because the resolution of the credibility of witnesses is a matter for the trier of fact, we must reverse and remand this case for a new trial. (*People v. Akis*, 63 Ill. 2d 296, 347 N.E.2d 733 (1976); *People v. Hoffman*, 45 Ill. 2d 221, 258 N.E.2d 326 (1970).) As the case is to be tried again, we note that although we do not agree with the defendant that the trial judge had a duty, *sua sponte,* to give an instruction as to the credibility of a drug user-informer witness (see, *e.g., People v. Hall*, 25 Ill. App. 3d 992, 324 N.E.2d 50 (5th Dist. 1975), and cases cited therein), a properly worded instruction modeled after IPI Criminal No. 3.17 would have been appropriate if tendered. (See *People v. Phillips*, 126 Ill. App. 2d 179, 261 N.E.2d 469 (1st Dist. 1970); *People v. Drumwright*, 48 Ill. App. 2d 392, 199 N.E.2d 282 (1st Dist. 1964).) We deem the other issue raised by the defendant on appeal, the court's alleged error in failing to inform grand jurors that they might request a recording of the testimony before the grand jury, to have been waived by failure to assign it as error in the post-trial motion, and do not address the merits of the issue.

For the foregoing reasons the judgment is reversed and the case is remanded to the Circuit Court of Wayne County for a new trial.

Reversed and remanded.

CARTER and JONES, JJ., concur.