*In re* UNION DRAINAGE DISTRICT NO. 1 OF TOWNS OF AFTON AND MILAN, Petitioner-Appellant, *v.* SPECIAL DRAINAGE DISTRICT OF TOWNS OF MALTA, MILAN, AFTON AND DE KALB, and UNION DRAINAGE DISTRICT No. 1 OF TOWNS OF SHABBONA AND MILAN, Respondents-Appellees.

(No. 71-374;

Second District—April 2, 1973.

Francis E. Cash and Roger W. Hayes, both of De Kalb, for appellant.

Rissman, Jenkins & Klein, of De Kalb, for appellees.

Mr. JUSTICE SEIDENFELD delivered the opinion of the court:

Petitioner, Union Drainage District No. 1 of the Towns of Afton and Milan (referred to as the "Afton-Milan district"), appeals from a judgment entered on a jury verdict finding that projected clean-out work on the ditches of its district would be of "O" benefit to respondents (Malta, Milan, Afton and De Kalb Special Drainage Districts referred to as the "Malta district"; and Union Drainage District No. 1 of the Towns of Shabbona and Milan, De Kalb County referred to as the "Shabbona district").

Petitioner contends that the evidence has made a case under Section 11—2 of the Drainage Code (Ill. Rev. Stat. 1971, ch. 42, par. 11—2)[1] for imposing liability on the respondent districts to bear a just proportion of the cost of the work to be performed. In its view, the jury verdict of "O" benefits to respondents was against the manifest weight of the evidence and resulted from prejudicial trial errors. More specifically it contends that the evidence at most showed that certain parts of respondent districts have a greater elevation than parts of petitioner district, and that this did not constitute a defense to the action.

The Commissioners of the Afton-Milan district filed their petition, accompanied by an engineer's estimate of the cost of the projected clean-out work, on January 13, 1971. None of the projected work is in the respondent districts. The work involves the clean-out of the main Afton-Milan ditch north of and downstream from Perry Road for a distance of about 5.93 miles. Of the total projected cost of $50,325.91, $4,398.90 was assessed against the Malta district, and $9,610.06 was assessed against the Shabbona district.

All three districts involved in this proceeding are located in the same watershed, and all of the water from the respondent districts' ditches empties into and through the Afton-Milan ditch. Direction of water flow is generally northerly.

The main ditch of the Afton-Milan district has its southern terminus about 60 rods north of an east-west road called McGirr Road. From this southern terminus, the Afton-Milan main ditch runs generally northeasterly for about 7.6 miles, at which point it crosses into the De Kalb Township "Outlet Area." The ditch has an average fall of about 2.3 feet per mile.

Respondent, Shabbona district, lies generally southwesterly from the Afton-Milan district. From its southern terminus, its ditch runs northeasterly for about 5.18 miles to a point about 60 rods north of McGirr Road, where it discharges its drainage waters in a straight line into the Afton-Milan district main ditch. The district itself has its northern boundary at McGirr Road, which lies some 2 miles south of the southern boundary of the proposed work (Perry Road). The fall of the Shabbona district ditch averages about 6 feet per mile.

---

[1] "Whenever any work constructed or ordered to be constructed by any drainage district has benefited or will benefit lands outside of that district but within the boundaries of another district * * *, the other district * * * is liable to the district conferring such benefits for the just proportion of the cost of such work and of the cost of the enlargement, improvement, maintenance, repair and operation thereof based upon the relation which the benefits to the lands in the other district * * * bear to the entire benefits from such work."

Respondent, Malta district, lies westerly and northwesterly from the Afton-Milan main ditch. Its ditch consists of two main branches; the North Branch runs for approximately 2.6 miles to a junction with the West Branch, which begins in Milan Township and runs easterly for 3.07 miles until the junction. Together the combined ditches run easterly for ⅔ of a mile, where the drainage waters are discharged in a straight line into the Afton-Milan main ditch. The North Branch, to its juncture with the West Branch, has a fall of approximately 5 to 6 feet per mile. The West Branch, to the juncture with the North Branch and thence to the outlet into the Afton-Milan main ditch, has an average fall of 9 feet per mile. There is 2½ feet of fall over the ⅔ of a mile that the branches run together, and a 1 foot drop at the outlet of the Malta ditch into the Afton-Milan ditch. From the outlet, going northerly downstream in the Afton-Milan district for approximately 2 miles, there is a fall of about 1 foot per mile.

The Afton-Milan district ditches were totally cleaned in 1948-1949, and in 1965 the portion south of Perry Road to the end of its ditch, 60 rods north of McGirr Road, was cleaned. The Shabbona district had clean-out work done on its main ditch in 1969. The work stretched north from its southern boundary to include not only the 60 rods north of McGirr Road, but 100 rods past into the Afton-Milan district, which 100 rods had been cleaned out in 1965. Prior to 1969, the Shabbona district had done no clean-out work since its inception in 1906. The Malta district was last cleaned out in 1954.

The respondents countered the *prima facie* case made out by the introduction of the petitioner's assessment role in evidence (Ill. Rev. Stat. 1971, ch. 42, par. 5—10) with the testimony of six landowners and two engineers. In substance the owners in the Shabbona district testified that the ditch in that district remained in good condition after the 1969 clean-up, and no crop damage had occurred since that date. One of the owners, whose land is on the southern boundary of the district, stated that poor drainage had caused him crop damage and some unworkable land prior to the clean-up, but that he had no such problems since 1969.

The landowners in the Malta district stated that both branches of the district's ditch were in good condition, with the North Branch having very little silt and a few willows of small growth, and the West Branch having no undergrowth or willows, a clear bottom, and smooth sides. The water was running well where the North and West Branches met, and the outlet at the Afton-Milan district was clear and open, with the water running at a "fast clip". The water was about 1 foot deep at the outlet, and 6 inches deep in other places. The land next to the ditch was

in good condition, none of the lands in the district were water damaged, and all land was under cultivation. One of the owners, whose farm is about ¾ of a mile from the Afton-Milan district, stated that the water in the ditch through his farm has gotten as high as ½ to ⅔ of the way up the 12 foot bank during wet periods, but receded to a foot within 24 hours when it stopped raining. He said the year before trial was the wettest year he could remember and he had no crop damage.

Francis E. Sexton, a Consulting Engineer Land Surveyor, testified on direct examination that he examined both of the respondent districts shortly before trial and found their ditches in very good condition. The Shabbona ditch had straight sides, uniform banks, and possibly a little sloughing near the bottom. The tile outlets were in good condition, and there were no willows or extra growth in the ditch. The Malta ditches were relatively straight and smooth, the outlets were in good condition, and there was a minimum of buildup of grass or turf. He found no silting where the ditches met the Afton-Milan ditch. He said the 6 foot per mile fall in the Shabbona district was slightly above average, which would be 4 or 5 feet per mile. Similarly, the Malta district fall of 6 to 9 feet per mile was above average. Conversely, he termed the Afton-Milan district, with a fall of about 2.3 feet per mile, a flat outlet. He said that due to these differences, the proposed work would have no effect on the velocity or capacity of the respondent districts' ditches to handle all of the water in those areas. Since the ditch at McGirr Road, the north boundary of the Shabbona district, is 9 feet higher than at Perry Road 2 miles away, which is the southern boundary of the proposed work, Sexton said that water could not back up from Perry Road to McGirr Road unless there were a 9 foot high blockage in the ditch at Perry Road. It was his opinion that due to differences in elevation, the respondent districts would not be benefited by the proposed work.

On cross-examination, Sexton said factors affecting the flow of water are the shape of the ditch, the obstructions in the ditch, the grade or fall at the bottom of the ditch, the alignment of the ditch, and the volume of water. He said that his statement that it would take 9 feet of water at Perry Road to impede the flow in the Shabbona district presumed a static condition, but that the present situation deals with a flowing rather than a static condition. He admitted that progressively over a number of years, the buildup could have some effect on the respondent districts.

Carter Sarver, a Civil Engineer, testified that he examined the Malta district ditches, and found the 6 foot per mile fall of the North Branch and 9 foot per mile fall of the West Branch would cause the water to have sufficient velocity to prevent silt from depositing in the ditches. He

said it would take considerable time before the condition of petitioner district, with its lower elevation, would have any effect on the flow in the Malta district.

In rebuttal, petitioner called a landowner in the Afton-Milan district who testified that in the previous fall and spring, which had been very wet, the water went over the banks at some points in the petitioner district. He did not observe water overflow in any other locality. However, a landowner in the Malta district testified that the water in his ditch had been slowed considerably in the last 3 or 4 years and that he had suffered crop damage due to the backup of water. He said he had seen the water 9 or 10 feet high in the ditch near his property but had never seen it overflow its 12 foot banks. He thought that the Malta district was not in good condition and needed cleaning.

Stanley W. Knetsch, a Consulting and Civil Engineer, testified on direct examination that his firm performed the work on the petitioner district in 1965 and on the Shabbona district in 1969, and prepared the plans and assessment roll for the presently projected work. His examination of petitioner district north of Perry Road revealed silt deposits in various places and at various depths ranging from a few inches to 14 or 15 inches. Some of the heaviest deposits were in the outlet area. He found both brush and trees in various stages of growth, and erosion of the banks of the ditch. He said that both of the respondent districts would be benefited by the proposed work in that if the work were not done, the impeded flow in the petitioner district, into which the respondent districts flow, would progressively impede the flow of the entire system and cause deterioration in the respondent's ditches. While the deterioration in the first few years, when the systems are in good condition, would not be marked, the rate of deterioration would accelerate at an increasing rate over a period of time. It would take a longer period for the Shabbona district to deteriorate than the Malta district, due to Shabbona's recent clean-out, and the 1965 clean-out of petitioner district adjacent to the Shabbona district. However, with a long enough progression of time, the results would be the same.

On cross-examination, Knetsch said that the silting at the south end of the petitioner district is minor compared to that at the north end of the district. He said that the Shabbona district is in good condition as a result of the 1969 work. He termed the 30 foot total fall in the Shabbona district a fair fall, which will accomplish drainage, and said that compared to the Shabbona fall, the fall of petitioner district is very flat. He said that the Malta district will clear itself for a short period, but as the silt builds up over a period of years, the deterioration will work its way upstream. He said that this would probably take about 20 to 30 years,

but that the increase in the carrying capacity of the petitioner's ditch will immediately benefit the respondents by insuring maximum velocity of flow in their ditches.

██ In order to be assessed for a drainage project, lands must be rendered more productive, more accessible, or the market value substantially increased and their actual or intrinsic value enhanced. (*People v. Allen* (1928), 330 Ill. 433, 443.) In absence of proof that the land would be benefited for agricultural purposes, the mere fact that the flow of water has or will be accelerated is not sufficient benefit to justify an assessment. (*Sangamon Drain. Dist. v. Houston* (1918), 284 Ill. 406, 408; *Inlet Swamp Drain. Dist. v. Gehant* (1919), 286 Ill. 558, 560-561.) The fact that lands are in the same watershed is not the deciding factor in cases of this kind. *Drainage Dist. v. Drainage Dist.* (1947), 398 Ill. 174, 188.

██ We have concluded that the respondents presented sufficient evidence to sustain their burden to show that they would receive no benefits from the projected work and that therefore they were incorrectly assessed.

██ It is undisputed that the ditch of the Shabbona district has been in good condition since the 1969 clean-out work and that no lands in that district have been flooded or crops damaged since that time. Except for the testimony of one of petitioner's witnesses all of the witnesses stated that the ditches in the Malta district are also in good condition and that there has been no crop damage there. The proposed work has its southern boundary at a point which is some 2 miles north of and 9 feet below the Shabbona district's northern boundary. This 2 mile stretch between the two districts was cleaned out in 1969. The fall of both of the respondent districts is somewhat above average and considerably greater than that in the petitioner district. It appears that the only immediate effect that the proposed work might have would be to insure the maximum velocity flow in the ditches of the respondent districts. However, it was disputed whether, due to differences in elevation and above average rate of fall, the work would even have an effect on the velocity of flow in the respondent districts. To the extent that the evidence is conflicting the verdict of the jury and the judgment of the trial court will not be interfered with unless clearly and palpably against the weight of the evidence. (*Inlet Swamp Drainage Dist. v. Gehant* (1919), 286 Ill. 558, 561.) The jury's finding of "O" benefits was not against the manifest weight of the evidence.

Petitioner has placed considerable reliance upon *Drainage Comrs. v. Drainage Comrs.* (1940), 373 Ill. 347, 351-2 in support of its contention that creating a faster flow would tend to lessen the deposit of silt in all

ditches. In that case, the tributary ditch emptied into the other ditch at right angles, and the land in both districts had comparatively similar slopes. In addition, there was testimony that before the work was done, the flow from one district into the other had been retarded. The court's conclusion that the finding of benefits was not against the manifest weight of the evidence was in accordance with the evidence in the case of a retarded flow but is not applicable under the facts before us.

■■ We do not agree with petitioner's contention that the respondents' expert witnesses were not qualified to testify in a case involving multiple district drainage. Both of these men had degrees in Civil Engineering, and both had experience with drainage structures and ditches. The fact that neither ever worked on a multiple district project has little effect on testimony as to fall and elevation; the crossing of district lines would not change the analysis of the issue. Nor do we believe that Sexton's testimony on direct examination as to the effect of an obstruction in static water conditions, while the situation here was not static, could have had any lasting misleading effect on the jury, since the true conditions were brought out on cross-examination.

■■ Petitioner's contention that the court·erred in admitting a map, which allegedly misrepresented the slopes of the district to the jury by reason of its inadequate scale, requires comment. The scales used on the map were in excess of 2,000 feet to 1 inch horizontal, and 5 feet to 1 inch vertical. While it is not necessary that a map be absolutely mathematically correct, it must be such as to enable the jury to apply the testimony more intelligently. (*Dept. of Public Works & Bldgs. v. Chicago Title & Trust Co.* (1951), 408 Ill. 41, 51-52, U.S. *cert.* den., 341 U.S. 931; *Brown v. Galesburg Pressed Brick Co.* (1890), 132 Ill. 648, 653.) Doubtless, .the exhibit taken by itself overemphasizes the slopes involved. (See *Hunter v. Sanitary Dist. of Chicago* (1912), 179 Ill.App. 172, 175.) But, in the context of the full testimony in the record and the overwhelming evidence that no benefit would be received by the respondent districts, we conclude that the error was harmless.

The judgment below is affirmed.

Affirmed.

T. MORAN and GUILD, JJ., concur.