MIDWEST UTILITY COMPANY, INC., Plaintiff-Appellee, *v.* CHICAGO TITLE & TRUST COMPANY, Trustee, Defendant-Appellant.

First District (1st Division) No. 76-190

Opinion filed June 27, 1977.

McDermott, Will & Emery, of Chicago (James E. Betke, of counsel), for appellant.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller (D. Kendall Griffith and William J. Holloway, of counsel), for appellee.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Plaintiff Midwest Utility Company, Inc. (Midwest) sued to foreclose a mechanic's lien to recover the unpaid contract price of a water treatment system it built for defendant Intercontinental Food Industries, Inc. (IFI), and for attorneys' fees under the contract. IFI counterclaimed for the amount paid Midwest, alleging breach of contract by Midwest.[1]

After a bench trial, the court entered judgment for plaintiff for the unpaid balance, with interest, and for attorneys' fees. Defendant's counterclaim was dismissed.

Defendant appeals, raising four issues: (1) whether plaintiff introduced any evidence that the system performed or could perform as warranted or that defendant caused the failure of the system to perform; (2) whether the trial court properly entered a protective order prohibiting defendant from introducing evidence of water flow through the system; (3) whether there was any evidence that defendant waived complete performance or was estopped from insisting on complete performance of the contract; and (4) whether plaintiff was properly granted attorneys' fees pursuant to the contract.

Mr. Harold Ritke is the president of Midwest Utility Company, Inc. He has a degree in engineering, is a licensed professional engineer in Illinois

---

[1] The only parties involved in this appeal are Midwest and IFI, hereinafter referred to as plaintiff and defendant, respectively.

and also holds an operator's license in water treatment and a license in sewage treatment plant operations. He has worked for Midwest for 14 years, where he has been primarily engaged in water treatment work. Prior to forming Midwest, Ritke worked as an engineer for Water Process Equipment for 10 years.

On February 19, 1972, Mr. Thomas of IFI called Ritke and asked him if he was interested in bidding on the design and construction of waste water treatment equipment for IFI's meat processing plant. On March 1, 1972, Ritke met Thomas at IFI's plant in Franklin Park, Illinois. Thomas told Ritke that the plant was still under construction. The plant would process and package meat and there would be some preparation, cooking and fast freezing. It would be necessary to clean the processing areas. The cleaning would be done in three steps. There would be tallow reclamation, drycleaning and high pressure water spraying. Some fats or hexanes would be in the water from the third phase. The wash water would also contain some solids from the meat. The wash water would run into drains in the floor and then into Metropolitan Sanitary District sewers. The Metropolitan Sanitary District required that discharges into its sewers contain less than 100 parts per million (ppm) of hexane solubles. IFI wanted a system which would reduce the hexane solubles in its wash water to the amount permitted by the District. It also wished to settle out the solids contained in the wash water.

Ritke asked Thomas for some design specifications for the desired equipment. Thomas would say only that the peak flows would be 20,000 gallons per hour, with a daily average of 160,000 gallons. Thomas gave Ritke no information about the nature or temperature of the expected flows.

Ritke testified that several days after his first meeting with Thomas, he met Thomas at the IFI plant to discuss a rough sketch which Ritke had made. Ritke asked Thomas for more details, but Thomas gave him none. Thomas said he wanted the simplest piece of equipment to reduce the hexane solubles. There was going to be an addition to the plant and at that time there would be better information available to design and construct a treatment plant. Thomas told Ritke that if he was interested in doing the job, he should submit a detailed sketch and a bid.

Subsequently Ritke submitted detailed plans and a bid to Thomas. Thomas told Ritke to submit his material to Altback and Brandman, IFI's consulting engineers. After submitting the plans to the consulting engineers, Ritke received terms and specifications from IFI. Ritke called Thomas after reading the proposal and terms and conditions, because certain items were contrary to the discussions which they had. Thomas told Ritke not to worry about the inconsistencies.

On March 30, 1972, Ritke sent a letter to Thomas attached to the terms

and conditions form. According to the letter, Midwest could not agree to the completion date set out in the IFI proposal. Midwest also told IFI that the system was designed to reduce hexane solubles to 100 ppm in order to comply with Metropolitan Sanitary District standards. Further, the letter stated: "In as much as there were no absolute sample analysis or quantity measurements we can hardly guarantee performance as absolute as that requested in this paragraph. We are fully confident the operation will be more than satisfactory but cannot accept liability for conditions over and above stated flows and normal wash waters with residual solids and grease."

Midwest's design called for the wash waters to flow from the drains in the floor of the plant to a pipe which ran to tanks in an enclosure outside of IFI's main building. The first tank was an aeration tank, in which nozzles mounted in the tank would force air into the wash water. This tank was intended to balance out the flows, equalize temperatures, keep the greases in suspension and provide a place for the introduction of chemicals, if required. An outlet pipe ran from the aeration tank through the clarifier tank wall into the clarifier tank. The water was to run through the pipe into the clarifier tank into a well in the center of the clarifier tank. The grease in the wash water would escape from holes near the top of the stilling well onto the surface of the water, where it would be moved along by scrapers. A scum box would collect the grease from the surface of the water where it would be pumped into a storage tank. The water with the grease removed was to flow from the clarifier into the sewers with less than 100 ppm of hexane solubles.

Ritke testified that the parties included a payment schedule in their contract. The terms of payment were $5,000 upon approval of final plans, $40,000 upon completion of the concrete tanks, $25,000 when the unit was operable and $6,765 thirty days after the date of completion. On May 1, 1972, Midwest started the project. IFI's first payment of $5,000 was made on May 26, 1972. On June 9, 1972, a contractor's affidavit and mechanic's lien waivers were sent to IFI in support of a $40,000 statement sent to IFI previously. After some negotiating with officials of IFI, Midwest received $20,000. In July 1972, Mr. Ritke finally saw IFI's president, Mr. Chapman, who would not authorize payment at that time. Ritke told Chapman that Midwest might have to leave the job because Midwest needed money to continue the work. Chapman said that contractors want money but never get the work done on time. Ritke told him that the work necessary for Midwest to start the job had not been completed in time for Midwest to start on schedule.

Ritke testified that in late July he spoke to a Mr. Oberman, who said he was a vice-president of IFI. Ritke told Oberman that Midwest could not complete the system until water and power were made available to it.

Oberman told Ritke that if Midwest hooked up the power and water and got the system running by the next week, he would see that Midwest was paid. Midwest hooked up power and water to the system although IFI's letter of March 29, 1972, said that this was not part of Midwest's work. The system was operating in late July or early August of 1972. Mr. Marks of IFI told Ritke that he would not be paid until Mr. Grassl approved the system.

In late August 1972, Ritke and Grassl inspected the system. Grassl complained that the effluent from the system was a dark color and smelled. Ritke explained that the system was only intended to settle solids and reduce hexane solubles before the wash water went into the sewers. Ritke observed that large quantities of very rancid grease were entering the system. Grassl explained that the shakedown of the plant was still occurring. The tallow recovery system was not functioning. Large quantities of grease were temporarily stored in barrels and later discharged from the plant. Some grease was accumulating on the aeration tank and was removed manually.

In late September or early October of 1972, Ritke met Mr. Grassl, Mr. Pawluczuk and Mr. Albergo at the IFI plant. They viewed the Midwest treatment system and agreed to make a list of modifications that Midwest would make. Midwest made those changes and did other work on the water treatment system that was not on the list of modifications or a part of the contract.

Mr. Ritke stated that in his opinion the system was in accordance with the specifications submitted as part of the contract. He also testified that in his expert opinion as an engineer the Midwest system would reduce hexane solubles from the wash water to less than 100 ppm if the amount of water did not exceed 20,000 gallons per hour and a daily average of 160,000 gallons, which were the requirements set out by Mr. Thomas in March 1972. Mr. Ritke said that when he had a sample of the effluent from his system tested, it showed that the hexane solubles were being reduced properly.

On cross-examination, Ritke testified that he had never designed a system such as IFI's before. He said that although he had designed or helped design approximately 50 water treatment systems, only three or four of them were industrial systems. However, Ritke said that all water treatment systems share similar characteristics and the components are similar in all systems. He did not tell Thomas that he had not designed such a system before. Thomas did not give Ritke the sources of his specifications for the system. Ritke testified that there was also rotten grease on the aeration tank in July 1973, and that this grease was accumulating because something other than wash water was entering the Midwest system. Ritke said that the only test that showed the system

reduced hexane solubles to less than 100 ppm was a test by the Metropolitan Sanitary District. Ritke stated that Thomas told him the permits would be obtained by the consulting engineers, Altback and Brandman.

Dr. Paul Levin, an engineer licensed in Illinois, testified for the plaintiff. He has a doctoral degree in environmental engineering from the Illinois Institute of Technology. He is a certified environmental engineer. He testified that all systems for the removal of waste from water are essentially the same. He stated that the Midwest system could remove 90 per cent of the hexane solubles from a peak load of wash water of 20,000 gallons per hour without the use of chemicals. With the use of chemicals, 95 per cent of the hexane solubles in wash water with 1,000 ppm of hexane solubles could be removed. If greater amounts of wash water were introduced into the system, the efficiency would fall.

On cross-examination, Dr. Levin testified that if the wash water had over 500 ppm of hexane solubles the system would not reduce them below 100 ppm. In his experience he had not seen a plant designed solely to remove hexane solubles. It would be possible to design a system to handle "normal wash water." The term "normal wash water" does not have an accepted meaning.

Dr. Levin also testified that in this system if three inches of grease accumulated on the aeration tank it is because somebody in the plant opened a valve to dump grease down the sewer.

Hugo Grassl, a project manager for A. Epstein & Sons Engineering, testified for the plaintiff. From May to September 1972, Grassl was the chief engineer for IFI. He supervised the sewage treatment and sanitation facilities for IFI. Grassl described the broiler facilities of IFI. Grease which was accumulated as a result of broiling meat was intended to be stored for tallow recovery and picked up by a scavenger. The tallow recovery system suffered many problems during August and September 1972. Pans for grease retrieval often overflowed. Pumps, motors and controllers of the grease removal system malfunctioned. Grease which was not supposed to have gone down the sewers did. It then entered Midwest's hexane removal system. After a shift or during lunch, accumulated grease from the processing of meat was hosed into the drains on the floor. As much as 150 extra gallons of grease would be put into Midwest's system per day. Grease from deep fat fryers would also end up in Midwest's treatment plant. Grassl said that Midwest's system was not designed to handle that much grease.

On cross-examination, Grassl testified that the Midwest system was too small to handle a plant the size of IFI. It was merely for primary treatment, not for heavy concentrations of fats. IFI did not spend the money to do the job correctly. The Midwest system could reduce hexane

solubles content to less than 100 ppm if the entering hexane content were 500 ppm and no more than 160,000 gallons per day.

In late July 1972, the accumulation of grease became so thick that two-by-fours had to be used to break up the accumulated grease at the top of the system's tanks. The excess grease from the fryers and broilers would be a steady flow, not a surge. The system would not work properly if it was overloaded with grease.

On redirect examination, Grassl testified that Midwest was probably misled about the type of effluent to go into their system.

Pursuant to agreement of the parties, plaintiff offered portions of the deposition of Robert William Edwards, an employee of IFI. Mr. Edwards said that in 1974 a new system, referred to as the Carborundum system, replaced Midwest's system. Prior to the replacement, Edwards had tests performed on the influent and effluent of the Midwest system. According to Edwards' recollection, the influent contained 500 ppm hexane solubles and the effluent contained 100 ppm hexane solubles. Until the Carborundum system was ready, the Midwest system was used. The Carborundum system treats about 300,000 gallons each eight-hour shift.

Also pursuant to agreement, plaintiff offered portions of the deposition of Donald E. Woodward, a project engineer for IFI from March 1972, until the time of his deposition. He stated that the tallow recovery systems were installed in the latter part of 1972. They had not operated continuously. If the tallow recovery system were not working, the grease going into the Midwest system could be increased by as much as 25 to 50 percent.

Henry Pawluczuk, an employee of IFI, testified for defendant. He was hired by IFI in March 1972. In August 1972, Pawluczuk was made responsible for the maintenance of the Midwest system. When Midwest's system first went into operation, approximately one to one and one-half inches of grease accumulated on the top of the aeration tank. Pawluczuk had been in charge of the in-plant grease removal system; he did not recall it being shut down on any occasion. He testified that the Midwest system was closed down in September 1973.

Mr. Pawluczuk testified that a meter recorded the water flow through the Midwest system. The meter measured the flow on a seven-day circular chart. The flow was printed in ink on the charts. Pawluczuk threw out the flow charts because dripping water had ruined them. No one ever asked to see those charts.

On cross-examination, Pawluczuk testified that the aeration tank was accumulating about as much grease in October 1972 as in August 1972.

Robert William Edwards, the chief engineer of IFI, testified for defendant. Edwards was experienced in the field of water treatment. He had worked on water treatment plants in the packing and meat

preparation industry for over 20 years. He testified that in September 1973 the cleaning of the processing area consisted of tallow recovery, dry cleaning and washing with water. Normal wash water means water necessary to put equipment and facilities in a sanitary condition. IFI closed the Midwest system in September 1973. In September 1973, a test of the influent showed that it contained 590 ppm of hexane solubles; the effluent contained 100 ppm of hexane solubles. The test was conducted at a time when the processing and the influent into Midwest's system were minimal.

On cross-examination, Mr. Edwards stated that the Carborundum system was operating in early 1974. The Midwest system was not closed down until the Carborundum system was available.

Donald E. Woodward, a project engineer with IFI, testified for defendant. He testified that the tallow recovery system was working most of the time from September 1972 to September 1973. There were times when it was not functioning for periods between 15 minutes and two days.

W. James Wells, Jr., an engineer specializing in environmental problems of the meat-packing and meat-processing industries, testified for defendant. Wells had previously worked on waste water treatment problems in the food industry. He examined the drawings of the Midwest system. Wells saw that system in operation. In Wells' opinion, the system could not consistently reduce hexane solubles below the 100 ppm level under the conditions Thomas had given to Ritke. The plant would remove only 40 to 60 percent of the hexane solubles. His opinion was that the water going into the Midwest system from the plant would contain 500 to 1000 ppm of hexane solubles.

By agreement of the parties, defendant offered into evidence portions of the deposition of William Thomas, formerly vice-president of engineering at IFI. He first contacted Ritke about the building of a grease removal system. He observed the system in operation after it was built. He observed grease accumulating in the system's first tank in September 1972. He was in charge of authorizing payments at IFI. He did not authorize payment to Midwest because they went beyond the completion date. Thomas had nothing to do with the Midwest system beyond October 1972.

Kenneth Ufferman, the general accounting manager of IFI, testified that daily reports relating to the production of meat patties in the charcoal broiler line were maintained at IFI. These reports indicated the amount of meat cooked and processed during August 1972.

Midwest's complaint alleged that pursuant to the contract with IFI it designed and built a water treatment system according to the requirements of the contract. It further alleged that defendant had failed

to pay plaintiff the full contract price for the system. Defendant's answer denied all of the material allegations of the complaint except the existence of the contract. Midwest filed an amended complaint which restated the allegations of the complaint and prayed for the payment of plaintiff's attorneys' fees as required by the contract. IFI filed a counterclaim for the return of all payments made to plaintiff because Midwest had not completed the performance of the contract, the system had failed to operate properly and performance was not timely, among other reasons. Plaintiff's answer to defendant's counterclaim alleged that if the system did not work properly it was because IFI had overloaded it with grease and had not operated the system properly.

The trial court in its written opinion and order stated:

> "This cause proceeded to trial on the allegations and prayers of the Plaintiff's complaint for Mechanics' Lien Foreclosure filed by MIDWEST UTILITY COMPANY, INC. ('MIDWEST'), plaintiff, and the answer and Counter-Complaint of the Defendant INTER-CONTINENTAL FOODS, INC. ('IFI'), defendant. Thereafter, FARMLAND FOODS, INC. ('FARMLAND') succeded to the assets and obligations of IFI and substituted as Party Defendant and Counter-Claimant for IFI herein. MIDWEST, in addition to seeking a Mechanics' Lien Foreclosure, seeks to recover reasonable attorney's fees pursuant to the provisions of the Contract [plaintiff's exhibit No. 7, paragraph 14d]. MIDWEST also seeks to recover interest.
>
> ＊ ＊ ＊
>
> MIDWEST contends that the system was built for IFI to treat 'wash waste water.' FARMLAND installed a new system known as a 'carborundum' system. The letter from MIDWEST to IFI dated March 30, 1972, [plaintiff's exhibit No. 8] stated that 'the system was meant to reduce wash water . . . to less than 100 parts per million of hexane solubles (fats) . . . We . . . cannot accept liability for conditions over and above stated flows and normal wash waters with residual solids and grease.' FARMLAND, in the Counter-Claim, seeks to recover the sum of \$25,000.00, the cost to FARMLAND for the 'carborundum' system plus \$10,000.00 consequential damages.
>
> The trial proceeded with evidence presented by the respective parties (MIDWEST and FARMLAND) to determine the issues set forth herein. The Court was presented with extensive evidence to clarify the meaning of 'wash waste water', 'wash water', 'stated flows'; with evidence as to the amount of the flow thru the MIDWEST system per day. Photographs, as well as movies, were exhibited, to fully acquaint the Court with the technical matters

involved. MIDWEST presented evidence that the system was built to accept 160,000 gallons per day, whereas the influent into the system from the IFI (FARMLAND's) plant was 300,000 gallons per day causing a non-anticipated overload on Plaintiff's system. MIDWEST also presented evidence that IFI failed to erect a shelter necessary to house the system, (in violation of the provisions of said contract) further, that the insufficient 'in plant' grease removal by FARMLAND caused the influent to contain grease and other items not anticipated. The influent from Plaintiff's system was discharged into the MSD sanitary system. Evidence received indicated that the MIDWEST system was used by IFI, without interference from the Metropolitan Sanitary District (MSD) for more than [sic] one year prior to FARMLAND's appearance as the new owner of the IFI assets. This continued use by IFI, together with other related facts, is indicative of the waiver by IFI of the acceptance of the independent testing agency report as a condition for payment, and IFI is estopped from asserting this defense.

MIDWEST exhibit 7 (Letter from MIDWEST to IFI dated March 30, 1972,) as an exception to the contract provides: 'In as much as there was no absolute sample analysis or quantity measurements we can hardly guarantee performance as absolute as that requested in this paragraph'. The balance due Plaintiff is the sum of $53,033.00.

    * * *

The Court having heard the evidence and observed the witnesses, including witnesses formerly employed as engineers for IFI, and having considered the interest of such witnesses in the present proceedings, finds:

a) That the preponderance of the evidence is in favor of MIDWEST and is against FARMLAND as successor to IFI, both as to the complaint of MIDWEST and the Counter-claim of FARMLAND.

    * * *

c) That the performance of the MIDWEST plant substantially complied with the dimensions and specifications of the Contracts and agreements (as amended) between the parties.

d) That the Plaintiff is entitled to interest, on the sum of $53,033.00 from August 1, 1972, pursuant to statute as follows: a) at the rate of 5% per annum to the date of the entry of a decree herein, b) at the rate of 6% per annum thereafter.

e) That the Counter-Claim of FARMLAND should be and is hereby dismissed.

f) That MIDWEST be and is hereby allowed $5,257.00 as attorney's fees in addition to the $53,033.00 under the provisions of the Contract.

It is therefore hereby ordered that MIDWEST, Plaintiff herein, present its decree of Mechanics' Lien Foreclosure * * *."

On October 15, 1975, a decree and judgment were entered in favor of plaintiff.

■■ In *Rankin v. Hojka* (1976), 42 Ill. App. 3d 440, 445-46, 355 N.E.2d 768, the court said:

"The determination of the credibility of the witnesses and of the weight to be accorded to the evidence is committed to the trier of the facts (*Geist v. Lehmann* (1974), 19 Ill. App. 3d 557, 312 N.E.2d 42) who has the opportunity to see and hear the testimony and resolve the conflicts arising from it (*McDonald v. Industrial Com.* (1968), 39 Ill. 2d 396, 235 N.E.2d 824), and his findings will not be disturbed unless manifestly against the weight of the evidence. (*M.E. Stein & Co., Inc. v. Jones* (1973), 13 Ill. App. 3d 184, 300 N.E.2d 553.) For a verdict to be against the manifest weight of the evidence, it must be clearly and palpably against the weight of the evidence (*Union Drainage District v. Special Drainage District* (1973), 10 Ill. App. 3d 829, 835, 295 N.E.2d 91) or an opposite conclusion must be clearly apparent. (*Karris v. Woodstock, Inc.* (1974), 19 Ill. App. 3d 1, 11-12, 312 N.E.2d 426.) Where several reasonable inferences are possible, those conclusions drawn by the trial court must prevail. (*City of Chicago v. Commonwealth Edison Co.* (1974), 24 Ill. App. 3d 624, 321 N.E.2d 412.)"

■■ From our review of the evidence and testimony, we conclude that the trial court's finding and judgment for plaintiff for the balance of the contract price was not against the manifest weight of the evidence. The evidence was sufficient to show that, because of an excess amount of grease, the wash water was not of the quality for which Midwest's water treatment system was designed.

Our conclusion makes it unnecessary to pass upon defendant's other contentions, except for the question of attorneys' fees.

■■ Defendant contends that the trial court improperly awarded plaintiff attorneys' fees because of the bankruptcy proceedings of IFI. The contract provided for reasonable attorneys' fees to the party who successfully prosecuted or defended a suit on the contract. This suit was filed March 29, 1973, and was pending at the time IFI filed its bankruptcy proceeding on August 7, 1973. Thus, plaintiff's claim for attorneys' fees was an existing claim at the time of the filing of the bankruptcy proceedings and was provable under section 63(a) of the Bankruptcy Act (11 U.S.C. §103(a) (1970)), even if not then due (*In re Crowder*, 301 F.

Supp. 1102 (E.D. Ark. 1969); *Brown v. Security Bank of Greinsborough,* 200 F.2d 405 (4th Cir. 1952)). Further, even if it was contingent in August of 1973, it was a provable claim under section 63(a)(8). In either event, it was discharged in IFI's chapter XI proceedings (see section 371 of the Act, 11 U.S.C. §771 (1970)). Having been discharged, the trial court erroneously entered judgment for plaintiff for attorneys' fees.

The judgment in plaintiff's favor for attorneys' fees in the sum of $5,275, together with interest and costs pertaining to that portion of the entire judgment, is reversed; in all other respects the judgment is affirmed.

Reversed in part and remanded in part.

GOLDBERG, P. J., and BUA, J., concur.